IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA     :
                             :
  v.                         :     3:CR-09-153-01
                             :     (JUDGE VANASKIE)
ERIC AMANKWAA                :
                             :

MEMORANDUM

This matter is before the Court on Defendant Eric Amankwaa's Motion to Suppress Evidence.[1] A hearing was held on October 22, 2009. For the reasons that follow, the motion will be denied.

I. BACKGROUND

At approximately 6:30 p.m. on Friday, April 10, 2009, Deputy Police Chief Henry Schrader, a thirty-four (34) year veteran of the Coal Township Police Department, received information that three individuals engaged in a suspected credit card scam were present in the local Walmart store. The information was supplied by a local Walmart Loss Prevention Officer ("LPO"), with whom Officer Schrader had worked many times. Specifically, the Walmart LPO called 911 to report that three (3) black males who matched the descriptions

---

[1] Defendant has moved to suppress both physical evidence as well as statements he purportedly made during a custodial interrogation. Government counsel has represented that no statements were obtained from Defendant and it has no intention of making use of any statement he may have made during the encounter that forms the premise for this motion. Accordingly, there is no need to address the aspect of the motion that seeks suppression of statements.

of persons involved in a credit card scam at other Walmart stores in the surrounding area were observed in the Coal Township store and that Walmart had been conducting an ongoing investigation into the matter.

Officer Schrader was dispatched by 911 and went to Walmart, arriving approximately five (5) minutes later. Upon his arrival in the parking lot of Walmart, Officer Schrader met the LPO, who informed Officer Schrader that the three (3) men had just left the parking lot in a red Equinox with a New York license plate and registration, the driver was a black man wearing a white t-shirt and blue jeans, these were the same three (3) individuals that had been caught on video tape involved in a credit card scam at other Walmart stores, the car had just ran a red light in making a left turn at the only exit of the parking lot, and the vehicle was proceeding in the direction of Shamokin, Pennsylvania. This conversation lasted between 20 to 30 seconds.

Officer Schrader exited the Walmart parking lot and proceeded on SR 61 towards Shamokin with his siren activated. At the intersection of Mount Carmel and Sunbury Streets, Officer Schrader observed a red Equinox matching the LPO's description stopped behind four (4) other cars at a red light, and he proceeded to pull the vehicle over. The stop occurred approximately 11/4 to 11/2 miles from the Walmart store.

The driver of the vehicle matched the description provided to Officer Schrader by the LPO. When Officer Schrader approached the driver's side window, the operator of the

2

vehicle stated that he did not have a driver's license with him, nor did he have his vehicle's registration card.[2] Consistent with the information provided by the LPO, there were two (2) other black males in the vehicle – Defendant Amankwaa was sitting in the right front passenger seat, and another black man was located in the back seat.

When Officer Schrader "ran" the Equinox license plate number, he found that it did not match the Equinox vehicle, but rather was assigned to a 1986 Oldsmobile Cutliss. At this point, the Walmart LPO arrived and identified the occupants of the Equinox as the persons who had used false credit cards in the Coal Township Walmart store.

Officer Schrader then requested that the vehicle occupants identify themselves. The driver identified himself as Yanik Paka, Defendant Amankwaa provided his name, and the person in the rear of the passenger compartment identified himself as "Bobo Lopy."[3] Officer Schrader was unable to confirm the identities of any of the individuals, and then conferred by radio with the detective on duty, Jeffrey Brennan.

Pursuant to Detective Brennan's direction, Officer Schrader then transported the three individuals to the Coal Township Police Station in order to obtain a positive identification. In accordance with Department policy, Officer Schrader handcuffed each of the individuals before placing them in his patrol car. The Equinox was towed to the Police

---

[2] The driver of the vehicle was eventually identified as Yanik Paka.

[3] Bobo Lopy would later be identified as Abdul Doumbia.

3

Station.

Detective Brennan met with Mr. Amankwaa and the others in an interview room at the Police Station. Initially, Detective Brennan conducted a pat-down search of each of the Defendants. Uncomfortable with the results of the pat-down due to the fact that Defendants were wearing multiple layers of baggy clothing, Detective Brennan instructed them to strip down to their underwear.

Mr. Amankwaa removed his clothes, handed them to Detective Brennan, who then proceeded to "pat down" the clothes, and place the clothing on a bench or table. During this process, Detective Brennan reached into the pockets of Defendant's clothing and found visa gift cards. He also searched Amankwaa's wallet, and found visa gift cards inside the wallet. Detective Brennan also found visa gift cards in the possession of Paka and Doumbia.

At the police station, Mr. Amankwaa provided Detective Brennan with his actual name and produced a confirmatory permanent resident card, a New York state driver's license, and a social security card. Nevertheless, Detective Brennan was not sure that Amankwaa's identification was authentic. Nor was he sure that the other Defendants were who they claimed to be. After Detective Brennan's attempt to confirm the individuals' identity with the Immigration Officer at the United States Penitentiary at Allenwood was unsuccessful, he had them transported to the Pennsylvania State Police Barracks in Stoneington, about seven miles away.

While the Defendants were being transported to the State Police Barracks, Detective Brennan took the visa gift cards to the Walmart store. By running the gift cards through the Walmart cash register system, Detective Brennan was able to learn that the cards were counterfeit. The Walmart LPO advised the Detective that some of the visa cards taken from the Defendants were used to make purchases at the store.

Detective Brennan next learned that the Defendants had been identified through the State Police fingerprint identification system. Specifically, he was advised that Amankwaa and Paka had correctly identified themselves, but that Doumbia had provided a false name. Detective Brennan then sought Paka's consent to search the Equinox, but he refused. Brennan directed that an inventory search of the Equinox be conducted.[4] He instructed that the inventory search should stop in the event that any Walmart bags or receipts were observed. During the inventory search, Officers observed gift cards and electronic video games in the back of the vehicle.

As a result of information gathered during the evening of April 10, 2009, Detective Brennan decided to charge each of the Defendants with criminal conduct. At approximately 9:30 p.m. or 10:00 p.m. on April 10, 2009, a criminal complaint was filed against each

---

[4] An inventory search without a warrant is permissible when police lawfully take a vehicle into custody in order to "protect an owner's property while it is in the custody of police, to ensure against claims of lost, stolen, or vandalized property, and to guard the police from danger." Colorado v. Bertine, 479 U.S. 367, 372 (1987).

individual, and they were detained in a local prison.

On Monday, April 13, 2009, Detective Brennan obtained a search warrant for the Equinox. In executing the search warrant, law enforcement officers found Walmart receipts and items that had been purchased from Walmart on Friday April 10, 2009, including electronic video games.

Detective Brennan was later placed in contact with United States Secret Service Special Agent Jason Wolfson. On April 28, 2009, Special Agent Wolfson obtained a federal complaint and arrest warrant for Amankwaa and the other Defendants. Special Agent Wolfson took Mr. Amankwaa into custody, and advised him of his <u>Miranda</u> rights. Mr. Amankwaa invoked his <u>Miranda</u> rights, and no questions were asked of him.

II.  <u>DISCUSSION</u>

Mr. Amankwaa challenges all aspects of his April, 2009 encounter with the Coal Township Police Department, including the initial stop of the vehicle operated by Mr. Paka, the search of his person and clothing at the police station, and the search of the vehicle on April 13. Because each aspect of the motion to suppress physical evidence implicates different Fourth Amendment jurisprudential principles, they will be assessed separately.

A. <u>Initial Stop of the Vehicle</u>

Mr. Amankwaa claims that the initial stop of the Equinox was invalid, and that all evidence obtained thereafter was the product of an illegal stop. Although pulling over a

6

vehicle does effect a "seizure" of the vehicle occupants within the ambit of the Fourth Amendment, see Michigan Dept. of State Police v. Sitz, 496 U.S. 444, 450-51 (1990), the Fourth Amendment protects against only those seizures of persons that are "unreasonable." See Terry v. Ohio, 392 U.S. 1, 9 (1968). In the context of investigative stops, the Supreme Court has declared that the resulting seizure of the person is not unreasonable "whenever the police officer has a reasonable, articulable suspicion that criminal activity is afoot." United States v. Goodrich, 450 F.3d 552, 559 (3d Cir. 2006) (citing Terry, 392 U.S. at 30). The threshold question, here, therefore is whether Officer Schrader had a reasonable and articulable suspicion that the occupants of the Equinox had engaged in criminal conduct sufficient to warrant the vehicle stop.

> As explained in United States v. Brown, 448 F.3d 239, 246-47 (3d Cir. 2006):
>
> Reasonable suspicion is an "elusive concept," but it unequivocally demands that "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981). An officer's objective basis for suspicion must be particularized because the "demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." Terry, 392 U.S. at 22 n. 18. At the same time, we must allow "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." United States v. Arvizu, 534 U.S. 266, 273 (2002) (internal quotation marks omitted); see also United States v. Nelson, 284 F.3d 472, 476 (3d Cir.2002). "The ultimate question is whether a reasonable, trained officer . . . could articulate specific reasons justifying [defendant's] detention." Johnson, 332 F.3d at 206.

7

> In evaluating whether there was an objective basis for reasonable suspicion, we consider "the totality of the circumstances – the whole picture." <u>Cortez</u>, 449 U.S. at 417; <u>Robertson</u>, 305 F.3d at 167. . . .
>
>> [t]he Supreme Court has repeatedly recognized that a reasonable suspicion may be the result of any combination of one or several factors: specialized knowledge and investigative inferences (<u>United States v. Cortez</u>), personal observation of suspicious behavior (<u>Terry v. Ohio</u>), information from sources that have proven to be reliable, and information from sources that – while unknown to the police – prove by the accuracy and intimacy of the information provided to be reliable at least as to the details contained within that tip (<u>Alabama v. White</u>).

And, of course, "reasonable suspicion" must be assessed on the basis of information known before the seizure; "information acquired subsequent to the initial seizure cannot retroactively justify a <u>Terry</u> stop." <u>Goodrich</u>, 450 F.3d at 559.

In this case, Officer Schrader had ample justification to conduct an investigatory stop of the vehicle in which Mr. Amankwaa was a passenger. He had received information from a loss prevention officer with whom he had worked in the past concerning potential criminal conduct at the local Walmart. Upon his arrival at the store, he received specific information from the LPO concerning the number of individuals believed to be involved in the illegal activity, a description of the individuals, and a description by make, model, color and license plate number of the vehicle in which they had just departed the scene. He was told they had run the red light at the only exit from the store parking lot, a fact that he confirmed by observing four cars at the same traffic signal as it turned green. He pulled over the vehicle

8

that matched the description provided by the LPO, both in terms of the automobile and its occupants.

In this case, both the quantity and the quality of the information provided by the LPO was sufficient to support a reasonable suspicion to justify the vehicle stop. Officer Schrader was presented with information of specific criminal wrongdoing: use of counterfeit access devices. He was given a detailed description of the alleged perpetrators. And he was provided a precise description of the vehicle. Thus, Office Schrader had information from a reliable source of specific criminal conduct committed by clearly identified persons. He pursued the vehicle in the direction it was observed leaving the store. He pulled over the vehicle matching the LPO's description a short distance from the store. It is thus clear the stop of the vehicle was the product of "reasonable suspicion." See Goodrich, 450 F.3d at 562-64.

"In determining whether an investigatory stop is legal, the court also examines its relative intrusiveness." Id. at 558 n.6. In this case, the stop at the intersection of Mt.Carmel and Sunbury Streets in Shamokin was not overly intrusive. The request for license and registration information was met with Mr. Paka's statement that he did not have either. The vehicle's license plate was registered to another vehicle. The LPO arrived on the scene and confirmed that the occupants of the Equinox were the individuals suspected of using counterfeit access devices at the Walmart. Routine checks of law enforcement information

failed to confirm the identity of the occupants. Under these circumstances, the vehicle stop and resulting seizure of Mr. Amankwaa did not abridge Fourth Amendment strictures.

### B. Search of Mr. Amankwaa at the Police Station

The government argues that the search of Mr. Amankwaa and his clothing that occurred at the Police Station was valid as incident to a lawful arrest. An investigative stop based upon reasonable articulable suspicion may, of course, ripen into a de facto arrest. United States v. Sharpe, 470 U.S. 675, 685 (1985) ("if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop"); United States v. Holyfield, 282 F. App'x. 129, 131-32 (3d Cir. 2008). "A 'de facto arrest occurs when the officers' conduct is more intrusive than necessary for an investigative stop.'" United States v. Hill, 91 F.3d 1064, 1070 (8th Cir. 1996). "When this occurs, the continued detention of a suspect must be based upon probable cause." United States v. McGrath, 89 F. Supp. 2d 569, 577 (E.D. Pa. 2000).

The circumstances in this case compel the conclusion that Mr. Amankwaa had been arrested at the time his person and clothing were searched. He had been handcuffed and transported from the scene of the stop to the Police Station. He was placed in the custody of an officer who was not involved in the investigative stop. His freedom of movement was curtailed indefinitely. Plainly, a reasonable person would have considered the situation to be an arrest. That Officer Schrader did not intone the phrase "you are under arrest" does

not change the fact that Mr. Amankwaa had been taken into police custody in a manner much more intrusive than an investigatory stop so as to constitute an arrest. See United States v. Lopez-Arias, 344 F.3d 623, 627-28 (6th Cir. 2003).

The controlling question is whether there was probable cause to support the de facto arrest. As explained in United States v. Stubbs, 281 F.3d 109, 122 (3d Cir. 2002):

> Police have probable cause to arrest if the circumstances are sufficient to cause a prudent person to believe that a crime has been committed and the person to be arrested committed it. Probable cause is determined by the totality of the circumstances. We must assess the knowledge and information which the officers possessed at the time of arrest, coupled with the factual occurrences immediately precipitating the arrest in determining if probable cause existed. '[P]robable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules.'

In this case, it is evident that Officer Schrader had probable cause to arrest the occupants of the Equinox, including Mr. Amankwaa. As noted above, he had reliable information from a credible source that the Defendants had used counterfeit access devices. The Defendants matched the description provided by the LPO. The driver of the vehicle could not provide a driver's license or vehicle registration. The license plate was not registered for the Equinox. Officer Schrader could not confirm the Defendants' identity. The LPO arrived on the scene and informed Officer Schrader that the Defendants were indeed the persons who had used and attempted to use counterfeit access devices to make purchases at the Walmart store only minutes earlier. Considering the totality of the

11

circumstances viewed from the perspective of a reasonable police officer, Officer Schrader did not act unlawfully in taking Mr. Amankwaa and the others into custody.

The search at the Police Station was thus made incident to a lawful arrest. As a general rule, a "warrantless search and seizure incidental to a lawful arrest, must be 'substantially contemporaneous with the arrest and . . . confined to the immediate vicinity of arrest' in order to be lawful." United States v. Miles, 413 F.2d 34, 40 (3d Cir. 1969) (quoting Stoner v. California, 376 U.S. 483, 486 (1964); citing Preston v. United States, 376 U.S. 364 (1964)). However, "[i]t is also plain that searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention." United States v. Edwards, 415 U.S. 800, 803 (1974); United States v. Crespo, 868 F.Supp. 79, 85 (M.D. Pa. 1994). In Edwards, the Court observed that a number of "courts of appeals have followed this same rule, holding that both the person and the property in his immediate possession may be searched at the station house after arrest has occurred at another place and if evidence of crime is discovered, it may be seized and admitted into evidence." 413 U.S. at 803.

In Edwards, clothing was taken from the defendant without a warrant about ten hours after he was arrested and taken into custody. In holding that the search and ensuing seizure of incriminating evidence did not offend Fourth Amendment concerns, the Court stated:

> once the accused is lawfully arrested and is in custody, the effects in his possession at the place of detention that were subject to search at the time and place of his arrest may lawfully be searched and seized without a warrant even though a substantial period of time has elapsed between the arrest and subsequent administrative processing, on the one hand, and the taking of the property for use as evidence, on the other. This is true where the clothing or effects are immediately seized upon arrival at the jail, held under the defendant's name in the 'property room' of the jail, and at a later time searched and taken for use at the subsequent criminal trial. The result is the same where the property is not physically taken from the defendant until sometime after his incarceration.

Id. at 807-08.

In this case, Detective Brennan undertook a thorough search of Mr. Amankwaa's clothing after a lawful arrest had been made. Because Mr. Amankwaa was lawfully in police custody, the search and seizure of the counterfeit access devices did not violate his Fourth Amendment rights. Accordingly, there is no basis for suppressing the evidence seized from Mr. Amankwaa's clothing.[5]

### C. The Search of the Vehicle

The government argues that Mr. Amankwaa lacks standing to challenge the evidence seized from the vehicle pursuant to a search warrant because he had no subjective expectation of privacy, and he had no possessory or property interest in the

---

[5] The fact that a formal arrest was made a few hours later that evening does not alter the result. It has been recognized that a search preceding a formal arrest is not unlawful where, as here, there was probable cause to effect the arrest at the time of the search. See, e.g., United States v. Riggs, 474 F.2d 699, 704 (2d Cir. 1973); United States v. Byran, 640 F.Supp. 1245, 1251 (D. Me.1986).

13

vehicle. (Govt's Br. Opp'n Mot. Suppress, Dkt. 52, at 4). During oral argument on the Motion to Suppress, defense counsel conceded that, if the initial stop of the vehicle was found to be lawful, Defendant did not have standing because Mr. Amankwaa was not claiming any ownership or possessory interest in the vehicle.

The Third Circuit has stated that an "essential element to a successful challenge of a search and seizure of a car on Fourth Amendment grounds is the existence of a legitimate expectation of privacy." Gov't of the Virgin Islands v. Williams, 739 F.2d 936, 938 (3d Cir. 1984) (citing United States v. Salvucci, 448 U.S. 83, 93 (1980); Rakas v. Illinois, 439 U.S. 128, 140 (1978)). "Fourth Amendment rights are personal rights," and there is "no recognition of the legitimacy of a defendant's expectation of privacy where the area searched is in the control of a third party." Id. (quoting Rakas, 439 U.S. at 132-34). "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." Id. (quoting Rakas, 439 U.S. at 134).

"It is clear that a passenger in a car that he neither owns nor leases typically has no standing to challenge a search of the car." United States v. Baker, 221 F.3d 438, 441-42 (3d Cir. 2000). In Williams, the court similarly held that a passenger lacked standing to contest the legality of the search of the vehicle, explaining that "because [defendant] Guadalupe had no legitimate expectation of privacy in the searched areas, we believe that

the district court properly denied his motion to suppress evidence." 739 F.2d at 939.

An identical conclusion is compelled here.[6] Because Mr. Amankwaa lacks standing to contest the validity of the vehicle search, his motion to suppress the evidence seized as a result of the search must be denied.

Even if he had standing to contest the search conducted pursuant to the warrant, and even if information learned as a result of the search of the clothing of Mr. Amankwaa and his co-Defendants is excised from the search warrant application, suppression would not be appropriate because probable cause for issuance of the warrant had been established. Defense counsel argued that the evidence seized from Mr. Amankwaa was the result of an illegal search, and that the illegally seized visa gift cards were used as evidence to obtain the search warrant of the vehicle, and, therefore, the evidence seized from the vehicle stemmed from the "fruit of the poisonous tree," necessitating suppression. Viewed another way, counsel is arguing that the affidavit of probable cause for the issuance of the search warrant of the vehicle contained "tainted" evidence, making the warrant invalid due to lack of probable cause.

Generally, evidence seized during an unlawful search, and derivative evidence, both tangible and testimonial, is excluded as fruit of the poisonous tree. See Wong Sun v.

---

[6] No evidence was presented at the hearing that any of the contents of the vehicle were the property of Mr. Amankwaa. Specifically, there was no testimony that any bags or gift cards in the vehicle belonged to Mr. Amankwaa.

United States, 371 U.S. 471, 484-85 (1963). In certain situations, however, illegal police conduct does not result in the suppression of evidence. "It is well settled law . . . that, even assuming that some factual averments in the affidavit are tainted, they do not vitiate a warrant which is otherwise validly issued upon probable cause reflected in the affidavit." United States v. Johnson, 690 F.2d 60, 63 (3d Cir. 1982) (citing United States v. Sterling, 369 F.2d 799, 802 (3d Cir. 1966)). Instead, "a redaction of the improper material from a search warrant is permissible." Johnson, 690 F.2d at 63 (citing United States v. Christine, 687 F.2d 749 (3d Cir. 1982)).

Probable cause to support issuance of a search warrant is defined as "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). "[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." Id. at 238-39 (quoting Jones v. United States, 362 U.S. 257, 271 (1960) (overruled on other grounds)).

Here, when information learned from the search of Defendants' clothing is redacted, there remains sufficient factual averments in the affidavit to sustain probable cause to search the Equinox. After removing portions of the affidavit containing evidence seized from the illegal searches of Mr. Amankwaa and the two (2) other individuals, the affidavit states:

16

> I have been a police office for fourteen (14) plus years and during such time I have investigated numerous criminal investigations including but not limited to Burglaries, Theft and Receiving Stolen Property. During these investigations I have applied for and executed numerous search warrants, identified and collected evidence and interrogations[.]
>
> On the above date [April 10, 2009,] Coal Twp Police received a telephone call from the Wal-Mart Store in Coal Twp in reference to three suspicious males. Wal-Mart Loss Prevention Officer's [sic] reported three black males were observed in the store and those three black males fit the description of persons who were going to other Wal-Mart Store [sic] throughout the area using stolen credit cards. Loss Prevention Officer's [sic] reported that the males had walked out of the store and left in a Red [sic] colored Chevrolet Equinox bear [sic] New York Registration # YVB594. The vehicle was stopped a short time later by Coal Twp Police Officer's [sic][.] During the course of the vehicle stop Officer's [sic] discovered the registration plate on the vehicle did not match the vehicle identification that was assigned to the vehicle. Officer's [sic] at the scene were also unable to identify the names of some of the persons in the vehicle. The three males were detained and brought back to CTPD.
> Loss Prevention Officer's [sic] from Wal-Mart also came to CTPD and report [sic] that the individuals did make several purchases with gift cards while they were at the store. I was advised that defendants purchased DSI Video games that were valued at $129.00 each.
> Loss Prevention Officer's [sic] from Wal-Mart also reported the same persons were in the Wilkes Barre Wal-Mart and other Wal-Mart Store [sic] throughout central Pennsylvania. The affiant was advised that the individuals may have been using a GPS unit to find the different stores throughout the area.
> The maroon colored Chevrolet Equinix [sic] VIN#13F776056903 [] was brought back to Coal Twp [sic] Police Dept. Officer's [sic] from Coal Twp began conducting an inventory search of the vehicle when Officer's [sic] observed gift cards[.] They also observed electronic video games in the back of the vehicle.

(Govt's Br. Opp'n Mot. Suppress, Exhbt. "A" at 2-3, Dkt. 52).

The affidavit states that the police received a telephone call from Walmart regarding

17

three suspicious individuals in the store, who fit the description of persons using fraudulent access devices in other Walmart stores. The LPO came to the police station and informed the officers that these three people made several purchases with fake gift cards at the Walmart store, and that these were the same people spotted at other regional Walmart stores. Additionally, Detective Brennan was informed that the three men purchased video games for the handheld game console unit Nintendo DSi. Furthermore, the red Equinox occupied by Defendants was found to contain gift cards and electronic video games. Therefore, there was ample information to find that there was a fair probability that the vehicle would contain evidence of criminal activity. Accordingly, Mr. Amankwaa is not entitled to suppression of the evidence seized from the vehicle.

III. CONCLUSION

For the foregoing reasons, the motion to suppress will be denied. An appropriate Order follows.

s/ Thomas I. Vanaskie<br>
Thomas I. Vanaskie<br>
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :
                                  :
  v.                              :   3:CR-09-153-01
                                  :   (JUDGE VANASKIE)
ERIC AMANKWAA                     :
                                  :

# ORDER

NOW, this 4th DAY OF JANUARY, 2010, for the reasons set forth in the foregoing Memorandum, IT IS HEREBY ORDERED THAT:

1. Defendant Eric Amankwaa's Motion to Suppress (Dkt. 38) is DENIED.

2. Trial shall commence with jury selection on February 22, 2009, at 9:00 a.m.

                                              s/ Thomas I. Vanaskie
                                              Thomas I. Vanaskie
                                              United States District Judge